IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

JENNIFER CONNORS                    CASE NO: 6:08-CV-206-Orl-22DAB

Plaintiff,

v.

ORLANDO REGIONAL HEALTHCARE
SYSTEM, INC., and SOUTH LAKE HOSPITAL, INC.

Defendants.
_____/

## THIRD AMENDED COMPLAINT

COMES NOW, PLAINTIFF, JENNIFER CONNORS, by and through undersigned counsel, and files this second amended complaint against ORLANDO REGIONAL HEALTHCARE SYSTEM, INC. d/b/a ARNOLD PALMER HOSPITAL FOR CHILDREN, WINNIE PALMER HOSPITAL FOR WOMEN AND BABIES, and DEPARTMENT OF OBSTETRICS AND GYNECOLOGY(hereinafter collected referred to as "ORHS"), and SOUTH LAKE HOSPITAL, INC., and states as follows:

## NATURE OF CASE

1. This action is brought by the Plaintiff against the Defendants ORHS and South Lake Hospital, Inc., who provided care for Plaintiff, JENNIFER CONNORS, for their failure to provide reasonable accommodations for Plaintiff's disability and for discrimination based on her disability. The Plaintiff experienced humiliation and discrimination in violation of her civil rights through Defendants' policies and practices of discrimination on the basis of disability.

2. This action claims that Defendants violated the Americans with Disabilities Act, III, 42 USC §12181 et seq. and the Rehabilitation Act, 29 USC § 794, Section 504. In this action, Plaintiff suffered damages and now seeks declaratory and injunctive relief and compensatory damages.

## JURISDICTION AND VENUE

3. Jurisdiction of this court is invoked the Americans with Disabilities Act, Title III, 42 USC §12181 et seq. and the Rehabilitation Act, 29 USC §794, Section 504.

## PARTIES

4. Plaintiff JENNIFER CONNORS is a resident of Florida. Plaintiff is deaf and communicates in American Sign Language and is a qualified individual with disabilities under the definitions of the Rehabilitation Act and the Americans with Disabilities Act.

5. Defendant, ORHS, is a nonprofit Florida corporation, licensed and doing business in Orange County, FL, and is located at 1414 Kuhl Avenue, Orange County and State of Florida.

6. Defendant ORHS manages and operates Winnie Palmer Hospital For Woman and Babies, Arnold Palmer Hospital for Children, Department of Obstetrics and Gynecology, and South Lake Hospital.

7. Defendant South Lake Hospital, Inc. is a nonprofit Florida corporation, licensed and doing business in Lake County, 1099 Citrus Tower Blvd, Clermont, Lake County, Florida.

8. Defendants South Lake Hospital, Inc. and ORHS jointly manage and operate

South Lake Hospital.

## FACTS

9. Title III of the Americans with Disabilities Act is known as the "Public Accommodations and Services Operated by Private Entities". 42 U.S.C. § 12181 et seq.

10. Section 504 of the Rehabilitation Act of 1973, provides that "No otherwise qualified individual with a disability" shall be "excluded, denied or discriminated against" by any facility receiving "federal financial assistance". 29 USC §794.

11. The Defendants provide public accommodations and programs and services within the meaning provided in the above cited laws.

12. The primary aid ORHS failed to provide is a qualified sign language interpreter for CONNORS during the care of the Plaintiff. This aid were repeatedly requested but denied by the Defendant during CONNORS' hospitalizations at ORHS dating on May 19, 2004, January 25, 2005, April 25, 2005, April 26, 2005, September 27, 2005, November 16, 2005, November 28, 2005

13. From January 2006 through April 2006, ORHS and South Lake Hospital Inc., failed to provide CONNORS a qualified sign language interpreter during her care and medical treatment.

14. In the first occasion on May 19, 2004, Plaintiff CONNORS went to ORHS with her husband and three children because she was seven months pregnant and had kidney problems which caused her pain. This was the first time the

Plaintiff had visited ORHS.

15. Upon arrival at the hospital, the Plaintiff requested an interpreter and then was directed to the eighth floor of ORHS where the Urgent Care unit for pregnant women is located. She waited two hours for a sign language interpreter without result.

16. CONNORS was forced to rely on her inattentive children, who often play around, to listen for her name. An ORHS staff member came to inform the family that they would be called soon. When the staff member approached CONNORS and her family, CONNORS again requested an interpreter but the staff member informed the family that she was unfamiliar with the process of requesting an interpreter. CONNORS and her family were to wait another hour before they were called despite the fact that CONNORS was in a lot of pain as she was unable to effectively communicate her condition to the Defendant ORHS's staff without the aid of interpreter.

17. Eventually ORHS performed a sonogram on CONNORS and sent her home without treatment. Defendant ORHS failed to provide an interpreter despite numerous requests and was therefore, without the necessary knowledge to properly address the issue of her pain as the physician and CONNORS lacked an effectively means to communicate.

18. In the second occasion on January 25, 2005, CONNORS went to ORHS because she needed corrective surgery by Dr. Bruce Redmon for a deviated nose septum.

19. During CONNORS care in Dr. Redmon's office, outside of the ORHS, the

Plaintiff was provided with a certified interpreter.

20. However, when she returned to ORHS, the site where the surgery procedures were to be performed, a certified interpreter was not provided despite having requested one before arrival.

21. Instead ORHS provided an inexperienced interpreter, a staff member in ORHS' X-ray lab, who knew some sign language, but was not a qualified interpreter.

22. The ORHS employee informed CONNORS that the hospital has a list of "interpreters" like her to call upon, all of which are also staff members at ORHS. The employee expressed her desire for ORHS to hire a certified interpreter for the Plaintiff.

23. During CONNORS surgery her husband was unable to follow what was going on during the procedure as ORHS failed to provide an interpreter for him, and the employee provided by ORHS was needed in the X-ray lab.

24. In the third occasion on April 25, 2005, CONNORS was nine weeks pregnant with her fifth child when she again returned to ORHS.

25. Upon arrival, CONNORS again requested an interpreter after explicitly explaining that she is Deaf, but the receptionist informed CONNORS that ORHS did not have a responsibility to provide an interpreter for deaf patients.

26. As a result CONNORS was often confused about the procedures to which she would be subjected because of the failure of effective communication. ORHS performed a checkup and was unaware of the fact that all mothers over the age of 35 had to go through a mandatory ultrasound.

27. Plaintiff CONNORS saw her baby on the ultrasound and did not see a heartbeat. CONNORS believed that the baby had expired but she could not understand why or explain her distress to the physician because there was no interpreter present.

28. The physician, Dr. Marcella Bujnovsky, left CONNORS alone crying and confused with her 9 month old daughter without explaining the results of the ultrasound with the Plaintiff.

29. CONNORS then requested a second opinion on the matter with an interpreter present. She requested that the baby be removed from her womb on that same day if the second test results confirmed that the baby was deceased.

30. Without an interpreter, Dr. Bujnovsky refused to do an operation to remove the baby if the Plaintiff sought a second opinion.

31. The doctor's assistant called ORHS for another ultrasound later that day at 4:00 in the afternoon.

32. When CONNORS arrived at ORHS later that day with her husband Bob, the receptionist at the registration office informed them that the appointment was never set up. The receptionist the attempted to contact Dr. Bujnovsky office asking for approval for a second opinion and was constantly refused.

33. She then attempted to contact another doctor at ORHS, Dr. McWhorter. Dr. McWhorter gave her an approval for a second opinion and agreed to do the surgery if the baby had expired. Upon meeting Dr. McWhorter's assistant, CONNORS and her husband requested an interpreter but were informed that all of the available staff members that have some knowledge of American

Sign Language left for the day.

34. Dr. McWhorter's assistant informed them by writing that the only list available at ORHS was the list of staff members that have some knowledge of American Sign Language. Dr. McWhorter then proceeded to perform a second ultrasound and confirmed that the baby was indeed dead. Dr. McWhorter communicated by writing that she would do the surgery in the morning. Dr. McWhorter took the written notes of the communication with her.

35. CONNORS then requested that an interpreter to be available in the morning for her husband Bob and for herself.

36. On April 26, 2005, CONNORS and her husband returned to ORHS for the surgery to remove the deceased fetus from her womb. Upon entering the pre-operation room the CONNORS discovered that an interpreter was not present. CONNORS then request that the receptionist call for an interpreter and the receptionist answered in the affirmative that she would. The same employee, from the X-ray lab, who was provided on January 25, 2005 eventually showed up.

37. The employee was not a certified sign language interpreter. As a result CONNORS could not understand many of the employee's attempts at translation and many of her questions went unanswered. Through the employee, CONNORS was able to learn that she had the option to order an autopsy of her child once it was removed form her womb. During the surgery was, the Plaintiff's husband, was once again left to act as the interpreter was the provided employee was needed in the X-Ray lab.

38. The Plaintiff's husband was unable to follow the events taking place and would have been unable to give permission to the doctors to perform any additional procedures that may be needed during the operation because the Defendant ORHS failed to provide the requested interpreter. Furthermore, following the surgery, the Plaintiff's husband was also unable to understand any instructions on post-procedure care for his wife, CONNORS.

39. In the fourth occasion on September 27, 2005, CONNORS become pregnant once again and returned to Dr. McWhorter's office at ORHS. Upon arrival, Connors again requested an interpreter for all of her appointments.

40. During her first appointment, she reiterated her requested that the Defendant ORHS provide an interpreter. The Defendant ORHS failed once again to provide the requested interpreter, instead a friend of CONNORS, Ana Dobles, also a nurse at ORHS, showed up to interpret. Ana Dobles is not a certified or qualified interpreter and she had trouble understanding the CONNORS' signs on various occasions.

41. CONNORS attempted to explain to Ana about her bad experiences with a midwife and her subsequent request for a physician. Ana, however, misunderstood and requested a midwife for CONNORS' next appointment on October 13, 2005.

42. On October 13, 2005, the miscommunication between Ana and CONNORS was discovered when a midwife came to meet CONNORS instead of the requested physician. CONNORS was forced to reschedule everything with Ana acting as the interpreter once again.

43. In the fifth occasion on November 16, 2005, CONNORS made an emergency call to Dr. McWhorter's office using video relay service because she was having another kidney problem. The staff members at Dr. McWhorter's office were confused with the call as they have no experience handling video relay calls. After being put on hold CONNORS was told that she needed to come to the eighth floor in ORHS.

44. CONNORS had failed to communicate effectively to the Defendant the level of her distress.

45. When she arrived to ORHS, a security guard helped her into a wheelchair. She informed the security guard that she was Deaf and needed an interpreter. The security guard then wheeled her up to the eighth floor where he was told to go to the first floor as the eighth floor was for women who are over 20 weeks pregnant.

46. When she arrived back to the first floor at 10:30 am, she asked the nurse at the desk to call an interpreter.

47. The nurse the proceeded to slammed her books down on the desk and shake her head in disbelief, causing CONNORS to feel ashamed and embarrassed.

48. CONNORS believed that the nurse was unaware of who she should contact to procure an interpreter so in a last effort to obtain someone to help her communicate she asked that they contact Ana. CONNORS was placed in a room in Urgent Care and was then ignored.

49. An hour after, a nurse came and communicated in writing that ORHS had called Ana and that she was on her way. CONNORS wrote to the nurse that

she was in a lot of pain but the nurse did nothing to alleviate her discomfort choosing only to take her blood pressure.

50. When Ana arrived, she informed CONNORS that she was present on the eight floor the entire time but that she was busy with a patient. Dr. McWhorter came in and looked at CONNORS with a sonogram of the baby and kidney. The physician was unsuccessful diagnosing her condition.

51. The physician only proscribed CONNORS a single shot of non narcotic medicine. All communication was done in writing. Ana then left after staying for approximately 10 minutes because she was extremely busy. CONNORS did not see her anymore for the rest of the day.

52. By 1:30 PM in the afternoon, CONNORS was upset as she was hungry and dehydrated. Plaintiff saw nurses passing out food to patients in the other rooms but the nurses failed to bring CONNORS any food or water.

53. Finally near the end of her stay around 3:00 PM, the nurse came in to check on CONNORS who requested food and a drink in writing. The nurse apologized and then proceeded to give her only crackers and a drink. The nurse checked her blood pressure for the second time. Plaintiff then was discharged and went home around 3:00 PM.

54. Upon information and belief, Arnold Palmer Hospital has a contract with at least two interpreting agencies, but instead, chooses to use its employees who are neither qualified nor certified sign language interpreters.

55. Ms. Connors became pregnant again in 2005; however, after her experiences at ORHS facilities in Orlando, she decided to go to South Lake Hospital in

Clermont, Florida.

56. South Lake Hospital Inc. has a management contract with ORHS. Both South Lake Hospital Inc., and ORHS are jointly liable for the management and policies and procedures of the South Lake Hospital facility.

57. She went to Dr. Kristina McLean and Dr. Mary Beth Lewis, who both have their offices on the first floor of South Lake Hospital.

58. Prior to going to South Lake Hospital, in January 2006, Connors called South Lake Hospital to ensure that she was going to receive interpreter services.

59. Rather than using a qualified sign language interpreter, South Lake Hospital used an employee of South Lake Hospital who knew some sign language as an interpreter for Connors.

60. In March 9, 2006, when a qualified interpreter was not being provided, and Connors did not understand the sign language from the staff member, Connors called up South Lake Hospital again, to speak to the administrator who was in charge of the provision of accommodations for persons with disabilities.

61. The administrator was not aware of the policies and procedures regarding providing auxiliary aids or services to persons who are deaf.

62. On April 3, 2006, Jennifer Connors, 33 weeks pregnant, went to the emergency room at South Lake Hospital with her husband Bob. She was having pains in her lower spine and it was hard for her to walk.

63. Prior to going to the hospital, she again spoke to an administrator at South Lake Hospital to ask for a certified interpreter. She was told that they would not do so because they used their own staff, and Connors insisted that the

hospital have a certified interpreter as she could not understand the staff member, and the staff member was not qualified to interpret medical terminology.

64. At the emergency room, Connors advised the person at the emergency room desk that she needed a sign language interpreter. A hospital staff member arrived, Tamara, who knew some sign language, advised Connors that she was not supposed to go to the emergency room and their policy was that if a person was over 22 weeks pregnant, she is supposed to be admitted upstairs in the maternity ward.

65. Tamara was not a qualified sign language interpreter and was not trained or qualified to interpret medical terminology.

66. Connors was upset as she was told by her doctor that told her to go to the emergency room. After Tamara went with her to the emergency room, Tamara advised Connors that she had to get back her own job, and left her phone number; thereby leaving Connors and her husband no means of communication.

67. At the time, Connors and her husband were very upset because there were still so many nurses talking to them and they had trouble communicating and did not know what to do.

68. Without seeing a doctor, or doing any tests, the employees of South Lake Hospital sent Connors home with no diagnosis and just told her to drink water. Connors had no idea why she was being sent home, or what was the problem with her pregnancy.

69. Connors was not able to ask questions or receive information due to her disability and failure to provide an interpreter.

70. When the employees of South Lake Hospital discussed the birth, Connors and her husband were told that Tamara would be interpreting for the birth, and Connors was upset as Tamara was not a qualified sign language interpreter and the conversations were not effective.

71. On April 14th, 2006, Connors went to the offices of Dr. McLean and Dr. Lewis office for her prenatal appointment. Connors again requested an interpreter and she was told that they were not legally have to provide them with an interpreter.

72. Connors was very upset about that because she wanted to discuss her injury that she had with her daughter's Karalyn's birth two years ago. She cracked her tailbone when she delivered Karalyn in water birth.

73. Connors and her husband arrived for her appointment and there was no interpreter for the appointment. They met with Dr. Lewis. Dr. Lewis appeared angry when she greeted Connors and her husband.

74. Connors tried to explain to her about her injury and the doctor argued with her. It was clear that Dr. Lewis did not understand Connor's English at all and Connors was upset about that because this is a serious medical issue.

75. Connors further wanted to discuss having her fallopian tubes tied, but could not understand what the doctor was saying and gave up.

76. Prior to the birth, Connors saw Dr. McLean, who was upset when Connors told her that she could not use the staff person to interpret and wanted a

qualified interpreter.

77. Dr. McLean ridiculed Connors and mocked her with hand gestures when Connors tried to explain about her symptoms. At the end of the appointment, Dr. McLean suggested that Connors treat with a different doctor – two weeks prior to her due date.

78. Plaintiff believed that her privacy rights were violated and was embarrassed to have her friend or uncertified interpreters with no interpreting policies being used as interpreters.

79. Plaintiff was ignored, humiliated and treated like a non-person by the Defendants and Defendants' employees and agents.  Defendants' actions resulted in Plaintiffs being irretrievably denied a complete understanding of the care provided by the Defendants.  Instead the Plaintiff experienced shame, anxiety, emotional distress, fear and discrimination.  Further all of the Plaintiff's care was made more difficult and painful by their inability to communicate with the nursing staff and doctors employed by the Defendants.

80. During the periods of time that the Plaintiffs were under the care of the Defendants, they were required to sign consent and other forms before any medical treatment would be administered.  These requests were made without a sign language interpreter present.  Plaintiff was not told of any of the risks involved nor benefits to weigh any possible choices between procedures.

81. Each and all of the above acts, both of omission and commission, were intentional acts of discrimination and each and all were a proximate cause of the damages suffered by the Plaintiff.

82. Defendants maintain a policy and practice of discriminating against persons who are deaf by intentionally failing to provide adequate auxiliary aids and services.

83. Defendants willfully, knowingly and intentionally discriminated against the Plaintiffs in violation of the Americans with Disabilities Act, Title III, 42 USC § 12181 et seq. and Section 504 of the Rehabilitation Act, 29 USC § 794, and caused the Plaintiffs to suffer and continue to suffer mental and physical pain and anguish.

84. Plaintiff's doctors currently use ORHS facilities, of which CONNORS will be required to utilize on a frequent basis, and CONNORS suffers from ailments of which she requires the services of facilities on a facility managed or owned ORHS, which includes South Lake Hospital.  As such, she will suffer harm if she is required to go to ORHS in the event of an emergency.  However, due to the frequent and deliberate failure to provide Connors with effective communication, Connors is afraid to go to an ORHS facility and encounter discrimination.  When Connors is assured that ORHS, and South Lake Hospital will implement and enforces policies and procedures which ensure effective communication and qualified interpreter services upon request, She will return to an ORHS facility, including South Lake Hospital.

85. Plaintiff has retained the services of The Law Offices of Matthew W. Dietz, P.L. and the A. Scott Harrison, P.A., and has agreed to pay them a reasonable fee for services in the prosecution of this cause, including costs and expenses incurred in this action.

# FIRST COUNT
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 USC §12181

86. Plaintiff realleges and incorporates by reference the allegations of facts in paragraphs one through 85.

87. Plaintiff's hearing loss substantially limits major life activities, including her ability to effectively communicate. Therefore, Plaintiff is an individual with a disability under Title III of the Americans with Disabilities Act. Plaintiff meets the essential eligibility requirements for Defendants' services at all times material hereto. Thus, Plaintiff is a qualified individual with a disability and is entitled to the protections of the Americans with Disabilities Act under 42 USC § 12181, et seq.

88. Defendants violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when they:

   a. Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities;

   b. Failed to ensure that communications with Plaintiff were as effective as communications with non-disabled patients;

   c. Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff;

   d. Failed to establish effective self-evaluations and/or provide notice of Plaintiff rights as an individual with a disability under the Americans

with Disabilities Act;

e. Excluded Plaintiff from services of the facility and denied Plaintiff the benefit of these services due to his disability.

**WHEREFORE,** Plaintiff respectfully pray that this Court grant the following relief against the Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiff to discrimination in violation of Title III of the Americans with Disabilities Act permanently enjoining Defendants from any practice, policy and/or procedure which will deny Plaintiff equal access to, and benefit from Defendants' services or which deny Plaintiff effective communication with Defendants. This includes entering a permanent injunction ordering Defendants:

a. To cease discrimination against Plaintiff and other deaf or hard of hearing patients;

b. To promulgate and comply with policies and procedures to ensure that Defendants and its staff do not discriminate against individuals who are deaf and hard of hearing;

c. To promulgate and comply with procedures to ensure that Defendants will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by Defendants;

d. To promulgate and comply with procedures to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting

explicit and clearly worded notices that state that the Defendants will provide sign language interpreters and/or other communication services to ensure effective communication with deaf or hard of hearing persons.

e.  Award reasonable costs and attorneys' fees; and

f.  Award any and all other relief that may be necessary and appropriate.

**SECOND COUNT**
**SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794**

89. Plaintiff realleges and incorporates by reference the allegations of facts in paragraphs one through 85.

90. Plaintiff is deaf and her disability substantially limits major life activities, including her ability to effectively communicate with others who do not know sign language. Therefore, Plaintiff is considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended. See 29 U.S.C. §706(8). Plaintiff is otherwise qualified under Section 504 of the Rehabilitation Act because she meets the essential eligibility requirements for Defendants' services at all time material hereto. Further, the Defendants are recipients of federal financial assistance.

91. Defendants' policies, practices and procedures, particularly the actions and omissions described above, violated the Plaintiff's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

92. Additionally, the Defendants also denied Plaintiff services that it made available to non-disabled patients.

93. Defendants violated Plaintiff's rights through their repeated refusal to reasonably accommodate Plaintiff with appropriate auxiliary aids and services or to modify policies and procedures to prevent discrimination.

94. Plaintiff suffered severe emotional distress and damages in the past, and continues to suffer distress and damages due to Defendants' violations of Section 504.

**WHEREFORE,** Plaintiff respectfully pray that this Court grant the following relief against the Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendants' practices, policies and procedures have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining the Defendants from any practice, policy and/or procedure which will deny Plaintiff equal access to, and benefit from the Defendants' services or which deny Plaintiff effective communication with the Defendants. This includes entering a permanent injunction ordering the Defendants:

   a. To cease discrimination against Plaintiff and other deaf or hard of hearing patients;

   b. To promulgate and comply with policies and procedures to ensure that the Defendants and their staff do not discriminate against individuals who are deaf and hard of hearing;

   c. To promulgate and comply with procedures to ensure that the Defendants will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by the Defendants;

    d. To promulgate and comply with procedures to ensure that the Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide sign language interpreters and/or other communication services that ensure effective communication with deaf or hard of hearing persons.

    e. Award compensatory damages

    f. Award reasonable costs and attorneys' fees; and

    g. Award any and all other relief that may be necessary and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITTED.**

### CERTIFICATE OF SERVICE

I HEREBY certify that I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system to **Bradley P. Blystone, Esq.**, MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, P.C., 315 E. Robinson Street, Suite 550, Orlando, Florida 32801-2719; **A. Scott Harrison, Esq.** 1801 Lee Rd. Suite 360, Winter Park, FL 32789, **Francis E. Pierce, Esq.**, CONNEY, MATTSON, et al., P.O. Box 4850, Orlando, FL 32802 on this 29th day of August, 2008.

    Law Offices of Matthew Dietz, P.L.
    Attorney for Plaintiff
    2990 Southwest 35th Avenue
    Miami, Florida 33133
    Telephone: (305) 669-2822
    Facsimile: (305) 442-4181
    Email: MatthewDietz@USDisabilityLaw.com

    By: /s/ Matthew W. Dietz
        Matthew W. Dietz, Esq.
        FL BAR NO.: 0084905